Matthew C. Helland, CA State Bar No. 250451
helland@nka.com
NICHOLS KASTER, LLP
235 Montgomery Street, Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

Aashish Y. Desai (SBN 187394)
aashish@desai-law.com
Adrianne De Castro (SBN 238930)
adrianne@desai-law.com
DESAI LAW FIRM, P.C.
3200 Bristol St., Suite 650
Costa Mesa, CA 92626
Telephone: (949) 614-5830
Facsimile: (949) 271-4190

Attorneys for Plaintiffs and the Proposed Class
*Additional Counsel Listed on Following Page*

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

David Burnett and Michael Paradise, as representatives of a class of similarly situated persons, and on behalf of the Western Global Airlines, Inc. Employee Stock Ownership Plan,

Plaintiffs,

v.

Prudent Fiduciary Services LLC, Miguel Paredes, James K. Neff, Carmit P. Neff, James K. Neff Revocable Trust dated 11/15/12, Carmit P. Neff Revocable Trust dated 11/15/12, WGA Trust dated 8/16/13, Selection Committee of the Western Global Airlines Inc. Employee Stock Ownership Plan, and John Does 1-10,

Defendants.

**Case No. 2:21-cv-9681**

**CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND EQUITABLE RELIEF**

**(1) Prohibited Transactions under ERISA (29 U.S.C. § 1106(a)–(b)**

**(2) Breach of Fiduciary Duties under ERISA (29 U.S.C. § 1104)**

**(3) Failure to Monitor Fiduciaries under ERISA (29 U.S.C. § 1104)**

**(4) Co-Fiduciary Liability under ERISA (29 U.S.C. § 1105)**

**(5) Knowing Participation in a Prohibited Transaction and/or Fiduciary Breach under ERISA (29 U.S.C. § 1132(a)(3))**

Paul J. Lukas, MN Bar No. 22084X*
lukas@nka.com
Kai H. Richter, MN Bar No. 0296545*
krichter@nka.com
Brock J. Specht, MN Bar No. 0388343*
bspecht@nka.com
Brandon T. McDonough, MN Bar No. 393259*
bmcdonough@nka.com
Jacob T. Schutz, MN Bar No. 0395648*
jschutz@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
**pro hac vice* applications forthcoming

**NATURE OF THE ACTION**

1. Plaintiffs David Burnett and Michael Paradise, as representatives of the Class described herein, and on behalf of the Western Global Airlines, Inc. Employee Stock Ownership Plan (the "Plan" or the "ESOP"), bring this action under the Employee Retirement Income Security Act , 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants Prudent Fiduciary Services LLC and Miguel Paredes (the "Trustee Defendants"); the Selection Committee of the Plan, including its members John Does 1–10 (the "Selection Defendants"); James K. Neff and Carmit P. Neff, individually (the "Oversight Defendants"); and James K. Neff and Carmit P. Neff, individually and as trustees of the James K. Neff Revocable Trust 11/15/12 and Carmit P. Neff Revocable Trust 11/15/12 (respectively), and the WGA Trust 8/16/13 (jointly) (the "Seller Defendants").

2. As described herein, Defendants breached their fiduciary duties with respect to the Plan in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries, by causing both the Plan and the company to be saddled with hundreds of millions of dollars of high-interest debt to finance the Plan's purchase of a minority stake in Western Global for several times more than its fair-market value (the "ESOP Transaction"). Plaintiffs bring this action to remedy this unlawful conduct, recover losses to the Plan, and obtain other appropriate relief as provided by ERISA

**JURISDICTION AND VENUE**

3. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee-benefit plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

4. This case presents a federal question under ERISA, and therefore this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

5. Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) because breaches of fiduciary duties giving rise to this action occurred in this district, and the Trustee Defendants may be found in this district.

## RELEVANT PARTIES

### THE COMPANY

6. James K. Neff and Carmit P. Neff (the "Neffs"), husband and wife, founded Western Global Airlines LLC ("Western Global" or "the company") in Estero, Florida in 2013. The U.S. Department of Transportation granted Western Global permission to operate as an air carrier in 2014.

7. Western Global is in the "ACMI" segment of the air cargo business, which refers to "wet leasing" arrangements in which the lessor provides aircraft, crew, maintenance, and insurance for purposes of transporting cargo of the lessee.

8. The Neffs, as trustees and beneficiaries of the James K. Neff Revocable Trust dated 11/15/12, the Carmit P. Neff Revocable Trust dated 11/15/12, and the WGA Trust dated 8/16/13, were the sole owners of Western Global during its first six years of operations. On or around October 22, 2020, the Neffs closed the ESOP Transaction, transferring a 37.5% minority interest in the company to the Plan. The Neffs, through their trusts, continue to control a majority 62.5% interest.[1]

9. The Neffs also control the company's board. The Neffs were the company's only two board members prior to the ESOP Transaction, and the Neffs

[1] In conjunction with the closing of the ESOP Transaction, the company converted from an LLC to a corporation, Western Global Airlines Inc. ("WGA Inc."). In 2021, the company changed its structure again, and the company's stock was transferred to a newly created holding company, Western Global Airlines Holdings Inc. ("WGAH Inc."). Shareholders of the company—the Neffs, through their trusts, and the Plan—thus exchanged their shares of WGA Inc. for shares of WGAH Inc. Unless noted

remained the company's sole board members for approximately one year after the ESOP Transaction. After pledging to appoint a third, independent board member in connection with the ESOP Transaction, the Neffs appointed a company insider to the third seat in the second half of 2021. The Neffs continue to comprise a majority of the company's board. The Plan does not have representation on the board.

10. Prior to the ESOP Transaction, the company did not own its aircraft. The Neffs controlled, and owned indirectly, the planes operated by Western Global, and Western Global leased those aircraft from the Neffs. Between 2018 and 2020, Western Global made between $20 million and $22 million in annual lease payments for the ultimate benefit of the Neffs. The company was also responsible for maintenance and repairs on the planes. In connection with the ESOP Transaction, the Neffs allege to have transferred ultimate beneficial ownership of their fleet of more than a dozen planes to the company. However, the Neffs did not transfer all of their planes to the company, and the company continues to make lease payments in exchange for use of at least one Neff-owned Boeing 747.

11. The Western Global fleet was, and continues to be, outdated compared to planes operated by its competitors. The Western Global fleet consists primarily of MD-11s built prior to 1996. As the company relies on an aged fleet, maintenance is a critical factor in company finances—both historically and in ongoing independent projections. Ratings agency Fitch noted in 2020 that "unexpected downtime across a few planes could drive significant operating volatility, as observed in 2019." *Fitch Assigns Final 'B+' IDR to Western Global Airlines, Inc.*, FITCH RATINGS (Dec. 23, 2020), https://www.fitchratings.com (hereinafter "*Fitch Assigns Final 'B+' IDR*"). Ratings agency Moody's noted that a 7% revenue decline in 2019 and a 23% decline in the first quarter of 2020 was caused by delays of Western Global's contracts "in

---

otherwise, references to "Western Global" or "the company" refer to the operative entity or stock issuer, as context requires.

order to perform maintenance on its aircraft." *Western Global Airlines, Inc. Credit Opinion*, MOODY'S INVESTOR SERVICE (Aug. 18, 2021), https://www.moodys.com/research/Western-Global-Airlines-Inc-Update-to-credit-analysis-highlighting-the--PBC_1292535. Regarding 2021 and beyond, Moody's stated "the age of [Western Global's] aircraft creates uncertainty around the company's ability to sustain this level of profits on a consistent basis." *Id*.

12. The company depends on a small group of customers at any given time. Western Global's top five customers in the first 4.5 months of 2020, which included Federal Express, Amazon, and the Department of Defense, provided approximately 65% of Western Global's revenue during that time. *See Moody's Assigns First-Time B2 Corporate Family and B3 Long-Term Unsecured Ratings to Western Global Airlines, LLC*, MOODY'S INVESTOR SERVICE (Jul. 29, 2020), https://www.moodys.com/research/Moodys-assigns-first-time-B2-corporate-family-and-B3-long--PR_428760 (hereinafter "*Moody's Assigns First-Time B2*"). Moreover, the company's customer base has not been stable over time. In 2019, a freight forwarder terminated a four-year contract after only a year due to performance issues tied to the condition of company's aircraft. Amazon was a new customer in 2020.

## THE PLAN

13. The Plan was established by the company, effective June 6, 2020.

14. The company is the sponsor of the Plan within the meaning of 29 U.S.C. § 1002(16)(B). According to the Plan's Form 5500 filed in 2021, the company is also the Plan's administrator within the meaning of 29 U.S.C. § 1002(16)(A).

15. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and an "employee stock ownership plan" within the meaning of 29 U.S.C. § 1007(d)(6).

16. The Plan was designed to invest primarily in "qualifying employer securities," as defined in 29 U.S.C. § 1107(d)(7).

17. On or around October 22, 2020, the Plan acquired 375,000 shares of the company's stock, representing 37.5% of the 1,000,000 outstanding shares, for $510 million, or $1,360 per share. The $510 million sale price corresponds to a minimum valuation of the company of $1.36 billion.[2] The Plan borrowed 100% of the sale price from the company, and is obligated to repay the company with interest.

18. In May 2021, the Trustee Defendants determined that, as of December 31, 2020, the Plan's shares were worth $875.17 per share, or $328,188,750, a $188 million reduction in value from the sale price approximately two months prior.

19. As of December 31, 2020, the Plan had 350 participants with account balances, and total net assets of negative $176,390,760.

## PLAINTIFFS

20. Plaintiff David Burnett resides in Bainbridge Island, Washington. Burnett began working for Western Global as a pilot in 2016, and is currently employed with the company in that capacity. Burnett has been a participant in the Plan since its inception, holds company shares allocated to his individual account in the Plan, and is a vested participant in the ESOP as defined by 29 U.S.C. § 1002(7).

21. Plaintiff Michael Paradise resides in Rockledge, Florida. Paradise began working for Western Global as a pilot in 2017, and is currently employed with the company in that capacity. Paradise has been a participant in the Plan since its inception, holds company shares allocated to his individual account in the Plan, and is a vested participant in the ESOP as defined by 29 U.S.C. § 1002(7).

## DEFENDANTS

### A. *Trustee Defendants*

#### Prudent Fiduciary Services LLC

22. Defendant Prudent Fiduciary Services LLC ("PFS") bills itself as a provider of independent fiduciary, ERISA compliance consulting, and expert witness

---

[2] If the valuation applied lack of control and marketability discounts to the ESOP's 37.5% stake, the implied company valuation would be greater than $1.36 billion.

services related to employee benefit plans such as qualified retirement plans and health and welfare plans. PFS is headquartered in West Covina, California. Prudent PFS was appointed Trustee of the Plan by Western Global Airlines, acting through a Selection Committee of its senior employees. As Trustee, PFS had the authority to negotiate and approve the ESOP Transaction on behalf of the Plan, including the price the Plan paid for company shares. PFS was also responsible for hiring Marcum, LLP, the accounting firm that has created appraisals of Western Global in connection with the ESOP Transaction and the Plan's ongoing regulatory obligations.

**Miguel Paredes**

23.     Defendant Miguel Paredes is the president and founder of PFS, the Plan's Trustee. Paredes holds title to the ESOP assets as the principal of the Trustee. In this role, Paredes had authority to negotiate and approve the ESOP Transaction on behalf of the Plan, including the price the Plan paid for company shares. Paredes also had the authority to select and retain Marcum, LLP, the accounting firm that has created appraisals of Western Global in connection with the ESOP Transaction and the Plan's ongoing regulatory obligations.

24.     At the time of the ESOP Transaction, PFS and Paredes—the "Trustee Defendants"—were fiduciaries of the Plan within the meaning of 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and had discretionary authority or discretionary responsibility in the administration of the Plan. The Trustee Defendants were the trustees of the Plan within the meaning of 29 U.S.C. § 1103(a), and as trustees of the Plan, the Trustee Defendants were named fiduciaries, within the meaning of 29 U.S.C. § 1102(a), under the terms of the written instruments under which the Plan was established and maintained.

25.     As fiduciaries and as parties providing services to the Plan, the Trustee Defendants were also parties in interest under 29 U.S.C. § 1002(14)(A), (B).

***B. Selection Defendants***

26. To effectuate the ESOP Transaction, the Neffs created a Selection Committee made up of their senior employees. The Selection Committee was responsible for hiring the Trustee Defendants.

27. John Does 1-10 represent the members of the Selection Committee, who are currently unknown to Plaintiffs. As members of the Selection Committee, John Does 1-10 had the authority to hire the Trustee Defendants and to remove them.

28. The Selection Committee and John Does 1-10—the "Selection Defendants"—hired the Trustee Defendants as the initial trustees responsible for managing and administering the Plan, and negotiating the sale price of company shares on behalf of the Plan.

29. The hiring of a plan trustee is a fiduciary act of managing and administering the Plan. The Selection Defendants are therefore fiduciaries of the Plan pursuant to 29 U.S.C. § 1002(21). As Plan fiduciaries, the Selection Defendants also qualify as parties in interest under 29 U.S.C. § 1002(14)(A).

***C. Oversight Defendants***

30. James K. Neff is the co-founder of Western Global, and has acted as its Chief Executive Officer from 2013 to the present.

31. Carmit P. Neff is the co-founder of Western Global and has acted as its Chief Innovation Officer from 2013 to the present, and previously served as the company's Chief Financial Officer.

32. In their capacities as officers, board members, and managers of the company,[3] the Neffs were responsible for orchestrating the sale of a minority stake in Western Global to the Plan. Before the "official" valuation of the company was

[3] Prior to the conversion of the company from an LLC to a corporation in conjunction with the closing of the ESOP Transaction, the Neffs were the managers that exercised ultimate legal and practical control of the company.

complete in October 2020,[4] the Neffs, acting on behalf of the company, (1) established the ESOP in June 2020; (2) closed on a $410 million corporate bond issuance at 10.375% in August 2020, for the sole purpose of financing the ESOP Transaction and paying the Seller Defendants (themselves) up-front; and (3) closed on an approximately $80 million loan to the company from Truist Financial in September 2020, also for the sole purpose of financing the ESOP Transaction and increasing the up-front payment to the Seller Defendants (themselves).

33.     Thus, while the Selection Defendants and the Trustee Defendants were responsible for signing off on the final valuation of the company and the size of the stake that could be acquired in exchange for the amount of financing that the company had raised, it was the Neffs, acting on behalf of the company, that determined that the Plan would buy its stake in the company at a minimum valuation of $1 billion.  By causing the company to borrow approximately $500 million for the exclusive purpose of funding an anticipated transaction that never contemplated more than a 49% stake changing hands, the Neffs committed to a $1 billion minimum valuation of the company before the Selection Defendants and Trustee Defendants performed their parts of the deal.

34.     In order to facilitate the transaction and secure at least their minimum required valuation, the Neffs selected the employees that would serve on the Selection Committee and, in turn, hire the Trustee.  In this capacity, the Neffs exerted influence over the Selection Defendants by dictating in broad form the terms of the sale, including the assumed minimum valuation of $1 billion.  The Neffs' influence was strengthened by their control over the compensation and, ultimately, the

---

[4] In connection with its October 5, 2020 application to the Department of Transportation to modify the company's operating certificate to reflect the anticipated change in corporate form associated with the ESOP Transaction, *see supra* ¶ 8, n.1, the company reported that the valuation of the company had not been finalized as of that date and was still "fluctuating," along with the size of the stake that the Plan would be allowed to acquire.

employment of the Selection Defendants. The Neffs further exerted indirect influence over the Trustee through their ability to direct the Selection Defendants to terminate the trustee, and subsequently replace any Selection Committee members who refused to do so.

35. The Neffs' role in appointing the Selection Defendants and directing their work is recognized as a fiduciary role under ERISA, 29 U.S.C. § 1002(21). The fiduciary authority to appoint or remove other persons acting in a fiduciary capacity carries a concomitant duty to monitor the work of the appointed fiduciaries. References in this Complaint to the Neffs as the "Oversight Defendants" relate to the Neffs' actions in their fiduciary capacity. Further, as fiduciaries and as directors, officers, and holders of more than 10% beneficial ownership of Western Global, the Neffs were at all times parties in interest to the Plan pursuant to 29 U.S.C. § 1002(14)(A) & (H).

***D. Seller Defendants***

36. Prior to the ESOP Transaction, Western Global was 100% owned by three trusts controlled by the Neffs: the James K. Neff Revocable Trust dated 11/15/12, the Carmit P. Neff Revocable Trust dated 11/15/12, and the WGA Trust dated 8/16/13.

37. James K. Neff is the sole trustee of the James K. Neff Revocable Trust dated 11/15/12, and is one of the two joint trustees, with Carmit P. Neff, of the WGA Trust dated 8/16/13. James K. Neff has full control over and access to the assets within each of the trusts. Upon information and belief, James K. Neff is the ultimate beneficiary of the James K. Neff Revocable Trust dated 11/15/12, and an ultimate beneficiary of the WGA Trust dated 8/16/13. These two trusts together, and James K. Neff through his beneficial interest in the trusts, have at all times held a greater than 10% interest in Western Global, the Plan's employer. The trusts and James K. Neff were therefore, at all times, parties in the interest to the Plan pursuant to 29 U.S.C. § 1002(14)(H).

38.     Carmit P. Neff is the sole trustee of the Carmit P. Neff Revocable Trust dated 11/15/12, and is one of the two joint trustees, with James K. Neff, of the WGA Trust dated 8/16/13.  Carmit P. Neff has full control over and access to the assets within each of these trusts.  Upon information and belief, Carmit P. Neff is the ultimate beneficiary of the Carmit P. Neff Revocable Trust dated 11/15/12, and an ultimate beneficiary of the WGA Trust dated 8/16/13.  These two trusts together, and Carmit P. Neff through her beneficial interest in the trusts, have at all times held a greater than 10% interest in Western Global, the Plan's employer.  The trusts and Carmit P. Neff were therefore, at all times, parties in the interest to the Plan pursuant to 29 U.S.C. § 1002(14)(H).

39.     On information and belief, upon the closing of the ESOP Transaction, the three trusts, and the Neffs as trustees and beneficiaries of the trusts, received $510 million from the Plan into accounts controlled by the trusts in exchange for a 37.5% stake in the company.  References in this Complaint to the Neffs as the "Seller Defendants" relate to the Neffs' actions as sellers of a minority stake in the company, and their receipt of $510 million into their trust accounts.

40.     As directors and officers of Western Global, the Seller Defendants had knowledge of the fiduciary status of the Trustee Defendants and the Selection Defendants, and their own fiduciary status as the Oversight Defendants.

41.     As directors and/or officers of Western Global, and through their involvement in the ESOP Transaction, the Seller Defendants had knowledge that the ESOP Transaction was for more than adequate consideration given their knowledge of the air cargo industry, their experience running Western Global in the years prior to the ESOP Transaction, and their prior experience with respect to the sale of an air cargo company to a private equity buyer.  The Neffs also had knowledge regarding negative valuation factors that does not appear to have been shared with other Defendants, including that the Neffs had recently purchased at least one plane, a Boeing 747, that the company would be leasing from the Neffs personally after the

ESOP Transaction closed, and the extent of ongoing maintenance and safety issues with respect to the fleet.

**DEFENDANTS' ERISA VIOLATIONS**

42. ERISA prohibits a fiduciary from engaging in self-dealing transactions: "A fiduciary with respect to a plan shall not ... (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." 29 U.S.C. § 1106(b). ERISA also prohibits transactions between a plan and a party-in-interest. 29 U.S.C. § 1106(a).

43. ERISA creates exceptions to this prohibition, however, by permitting such transactions where "the plan receives no less, nor pays no more, than adequate consideration," 29 U.S.C. § 1108(b)(17)(A), and for "the acquisition or sale by a plan of qualifying employer securities ... (1) if such acquisition [or] sale ... is for adequate consideration." *Id.* § 1108(e)(1). "Adequate consideration" is defined as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary." *Id*. § 1002(18). "Fair market value" is the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Brundle ex rel. Constellis Empl. Stock Ownership Plan v. Wilmington Trust N.A.*, 241 F. Supp. 3d 610, 617 (E.D. Va. 2017); *accord Cosgrove v. Circle K Corp.*, 915 F. Supp. 1050, 1064 (D. Ariz. 1995).

44. A fiduciary that engages in a self-dealing transaction pursuant to 29 U.S.C. § 1108(e) has the burden of proving that he fulfilled his duties of care and loyalty and that the ESOP received adequate consideration. *Howard v. Shay*, 100 F. 3d 1484, 1488 (9th Cir. 1996) (citing *Donovan v. Cunningham*, 716 F. 2d 1455, 1467-68 (5th Cir. 1983)). "This burden is a heavy one." *Id*. "When it is possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an

intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Id.*

45.    As discussed above, on or about October 22, 2020, the Seller Defendants sold 37.5% of Western Global to the Plan for $510 million, reflecting a valuation of the company of at least $1.36 billion (see supra ¶ 17 & n. 2).   There are numerous indicators that this was far above fair market value, giving rise to an inference that the sale was a prohibited transaction, and that the Trustee Defendants, Selection Committee Defendants, and Oversight Defendants breached their fiduciary duties in their respective roles relating to the sale.  The following examples are illustrative.

**Historical Earnings Demonstrate the Plan Paid Substantially More than Fair Market Value for its 37.5% of the Company**

46.    One of the "two basic methodologies" that are "commonly employ[ed]" by ESOP valuation professionals is the Guideline Company Method, which uses publicly traded companies similar to the subject company to identify a factor by which the subject company's earnings should be multiplied to determine the company's total enterprise value.  *Brundle*, 241 F. Supp. 2d at 618.  Under this method, the total enterprise value is then adjusted downward if the company is viewed as riskier than the comparable public companies, for the lack of control given to the ESOP, or for the lack of marketability for the ESOP shares.[5] *Id.*

47.    One of the most common metrics used to measure a company's earnings for valuation purposes is earnings before interest, taxes, depreciation, and

---

[5] As Marcum, LLP—the appraiser hired by the Trustee Defendants—states on its website, "[T]he consideration of discounts for lack of control and lack of marketability are important in any valuation analysis, particularly those involving non-controlling ownership interests in privately-held companies. . . . It is not unusual in the valuation of a non-controlling ownership interest in a privately-held company for the resultant value to be 50%-80% of the value of the company on a controlling, fully-marketable basis."  Sean Saari, Partner, Marcum, LLP, *An Explanation of Discounts for Lack of Control and Marketability*, Feb. 18, 2017,

amortization ("EBITDA"). A company's EBITDA is used to compare the value of a business to other similar businesses by looking at trading multiples, or what the value of the company is as a multiple of its annual EBITDA. These multiples can be assessed either by what similar companies are currently worth, expressed via market cap or enterprise value,[6] or by comparing the company in question to other businesses that have recently been sold or acquired in the same industry.

48. According to Fitch, two of Western Global's primary peers in the air cargo industry are Atlas Air Worldwide Holdings, which trades as AAWW, and Air Transport Services Group, ticker ATSG. *See Fitch Assigns Final 'B+' IDR at 3*. Analysis of each company's annual reports demonstrate that each company's primary business line is ACMI, as is the case with Western Global.

49. As of September 30, 2020—the end of the last quarter before the Western Global sale valuation was finalized by Defendants—Atlas Air Worldwide Holdings had an enterprise value of $3.84 billion and five-year average[7] EBITDA of $522 million per year, for a 7.4 EBITDA multiplier. Air Transport Services Group

---

https://www.marcumllp.com/insights/an-explanation-of-discounts-for-lack-of-control-and-marketability (last accessed Dec. 14, 2021).

[6] Enterprise value includes the market cap of a company but also short-term and long-term debt as well as any cash on the company's balance sheet, and is a popular metric used to value a company. *Brundle*, 241 F. Supp. 3d at 618; *Enterprise Value*, INVESTOPEDIA, https://www.investopedia.com/terms/e/enterprisevalue.asp (last visited Dec. 12, 2021).

[7] Assessing five-year historical financial data is standard industry practice in business valuation. *See, e.g.*, Agreement Concerning Fiduciary Engagements and Process Requirements for Employer Stock Transactions at 17, *Perez v. GreatBanc Trust Co.*, 5:12-cv-01648-R-DTB (C.D. Cal. Jun. 6, 2014) (settlement agreement requiring ESOP sponsor to provide financial statements of the preceding five fiscal years to trustee, and requiring the valuation analysis to consider "[a]t a minimum . . . how the projections compare to, and whether are reasonable in light of, the company's five-year historical averages and/or medians and the five-year historical averages and/or medians of a group of comparable public companies (if any exist) . . . unless five-year data are unavailable[.]"

had an enterprise value of $3 billion and five-year average EBITDA of $338 million, for an 8.9 EBITDA multiplier.

50. In comparison, using financial data reported to the Department of Transportation by Western Global, over the five-year period ending September 30, 2020, Western Global's 5-year historical average EBITDA was around $46 million. The average EBITDA multiplier of 8.15 from the AAWW and ATSG analysis above results in a total enterprise value of Western Global of $375 million (*before* discounts are applied), substantially less than the implied valuation of at least $1.36 billion (*after* discounts, if any) used in the connection with the ESOP Transaction. The ESOP Transaction price also corresponds to an EBITDA multiplier of at least 29 times 5-year historical average EBITDA, more than triple the EBITDA multiplier that can be supported by valuations of comparable public companies.

51. This valuation can also be adjusted to account for the cessation of lease payments in connection with the transfer of ultimate ownership of more than a dozen planes to the company in connection with the ESOP transaction.[8] Subtracting all lease payments from the company's expenses results in an adjusted 5-year historical average EBITDA of around $65 million. The comparable public company EBITDA multiplier of 8.15 results in a total enterprise value (*before* deductions) of $528 million, which fails to support the implied valuation (*after* deductions, if any) of $1.36 billion. The ESOP Transaction price also corresponds to an EBITDA multiplier of at least 20 times the lease-adjusted 5-year historical average EBITDA of the company, more than twice the EBITDA multiplier that can be supported by valuations of comparable public companies.[9]

[8] This is a favorable assumption to Defendants, as the company continued to make lease payments on at least one plane after the ESOP Transaction. *See supra* ¶ 10.
[9] The market value of the planes themselves does not come close to making up the difference, see *infra* ¶ x.

52.     But even this price would have been well above fair market value, given how much riskier Western Global is as an enterprise compared with Atlas Air and Air Transport Services Group. *See Brundle*, 241 F. Supp. 3d at 618.  Among these unique risks were (1) Western Global's more concentrated lines of business, engaging exclusively in the ACMI business line  and charter services while Atlas and ATSG also engaged in dry leasing to diversify their revenue stream; (2) the advanced age and relatively poor condition of Western Global's fleet of aircraft, which had historically caused customer service issues and revenue drops, *see supra* ¶ 11; (3) a more concentrated customer base, *see supra* ¶ 12, (4) a much shorter operating history, with Western Global only having been in business for six years as of the time of the ESOP transaction, *see Moody's Assigns First-Time B2*, at 1 (noting Western Global's "volatile operating history" as one reason for a lower credit rating given that Western Global "has yet to demonstrate consistent operating results") and (5) Western Global's concentrated ownership structure, *see Fitch Assigns Final 'B+' IDR* at 3 ("Fitch considers [Western Global] to be subject to typical risks associated with a highly concentrated ownership structure, such as concentrated decision making and a lack of independent oversight.  The founder and CEO (and family) continue to control a majority stake in the business following the [ESOP] transaction.").  This estimated enterprise value also does not account for appropriate lack of control and marketability discounts that should have been applies (as Plaintiffs discuss below).

**Defendants' Valuation Gave Improper Weight to 2020 Earnings Levels, Ignoring Temporary, Cyclical Factors Responsible for Surge in Profits**

53.     Given that Western Global's long-term financial performance did not justify the ESOP Transaction valuation, it appears that Defendants relied on the company's higher earnings in 2020 to support their valuation.  More specifically, the outbreak of COVID-19 in March 2020 caused a surge in online shopping, resulting in a large increase in demand for air freight transportation services.  Thus, the second and third quarters of 2020—the only two post-pandemic quarters of data the

Defendants would have had available—were the two most profitable quarters in Western Global's history, with net profits of $74 million in the second quarter and $37 million in the third quarter, producing more than double the profits that Western Global had earned in its previously most profitable year.[10]

54. However, relying on a mere two quarters of higher profits and assuming they represent an entirely new level of profitability for the company, as the Defendants appear to have done, was flawed. As Fitch Ratings, a leading provider of credit ratings, explained in its analysis of Western Global's August 2020 bond offering: "[Western Global] and other freight-focused airlines are benefitting from the [pandemic-induced] steep drop off in cargo capacity in passenger airlines which has outpaced the decline in demand for shipments. This imbalance, which Fitch assumes will be temporary should support *outsized performance* in 2020[.]" *Fitch Assigns Final 'B+' IDR*, at 1 (emphasis added). This sentiment was shared by Moody's, another leading credit ratings agency, which made note of Western Global's pandemic-fueled windfall resulting from "a significant increase in demand for cargo aircraft as belly space of passenger aircraft declines." *Moody's Assigns First-Time B2*, at 1.

55. The temporary and cyclical nature of the 2020 surge in profits is best demonstrated by a historical analysis of the two primary factors that play a large role in determining the profitability of air cargo companies, and are almost entirely outside the company's control: the freight rate, meaning the price paid to ship goods a certain distance, and the load factor, meaning the average percent of the plane's capacity filled on each flight. Pandemic-induced demand led 2020 to be an *all-time high* in both the freight rate and the load factor for air cargo transportation. *WATS$^{+}$ World Air Transport Statistics 2021*, INTERNATIONAL AIR TRANSPORT ASSOCIATION

[10] The company also received $34 million in one-time federal funds in 2020 to save jobs threatened by the COVID-19 pandemic. Because the pandemic boosted Western Global's business, Congress has asked the company to repay those funds.

1, 6 (2021).[11] Below, in blue, is the average freight rate charged between 2000 and 2020.

56. The record-setting freight rates happened to coincide with an all-time high for load factor, or the percentage of an aircraft's cargo carrier capacity that is utilized, as shown by the below graph, showing air cargo load factors between 2000 and 2020.

[11] *See* https://www.iata.org/contentassets/a686ff624550453e8bf0c9b3f7f0ab26/wats-2021-mediakit.pdf



57.     The charts demonstrate that historically, these factors are both cyclical and relatively volatile, and that both reached historical highs in 2020.  The highest rates charged per kilogram shipped, combined with the fullest planes in history, equals the highest profits ever.

58.     Cyclical industry factors such as this must be accounted for in the appraisal process to arrive upon an accurate valuation.  *See 2020-2021 Uniform Standards of Professional Appraisal Practice*, THE APPRAISAL FOUNDATION Standard 9, Rule 9-4 ("An appraiser must, when necessary for credible assignment results, analyze the effect on value, if any, of . . . financial and economic conditions affecting the business enterprise or intangible asset, its industry, and the general economy.").

59.     Projecting these historical highs to continue indefinitely into the future, as appears to have been done, was a grave error because markets adjust.  Even if the surge in demand for air cargo and the drop in passenger air travel become a permanent feature of the global economy, the profits associated with this type of surge necessarily dwindle as the "industry rebalances," as Fitch determined, through events such as the entry of new competitors, or the capacity of existing competitors

expanding as they purchase planes from commercial passenger airlines who no longer need as many planes. *Fitch Assigns Final 'B+' IDR*, at 1–2. Thus, respected credit analyst Fitch did not overreact to the temporary upswing in profits, projecting in December 2020 a "going forward" annual EBITDA of $65 million per year, which Fitch believed supported an enterprise value for Western Global of only $357 million, roughly four times less than the valuation applied to the ESOP Transaction.

**Defendants Overvalued the Fleet**

60. Defendants have touted the transfer of ultimate ownership of 16 planes from the Neffs to the company as a source of additional value that justified the ESOP Transaction price. In fact, the value of the fleet, when combined with the fair market value of the company, could support, at most, a price of around one half of the valuation used in connection with the ESOP Transaction.

61. The company itself, after the ESOP Transaction closed, reported only a $175 million increase in the total value of its operating equipment to the Department of Transportation. Additional equipment worth $175 million would have been insufficient to justify a $1.36 billion valuation based on 5-year average historical EBITDA and reasonable, objective future projections. *See supra* ¶¶ 46-59. Even assuming no historical or ongoing lease payments and no adjustments for lack of control or marketability (generous assumptions in Defendants' favor given the facts), the additional equipment could support a value of only around half of the ESOP Transaction valuation.

62. The fair value of the planes, however, was likely much lower. In connection with the company's subsequent purchase of MD-11s similar to the majority of the planes transferred from the Neffs to the company, an independent valuation professional opined that the planes were worth $5 million to $13 million, depending on condition. The MD-11s subject to the subsequent sale, however, were all manufactured in 1998, and thus were newer than the Neff-transferred MD-11s, which were manufactured between 1990 and 1995. In addition, the Neff-transferred

planes had well-documented maintenance issues that had hampered company performance in the past.  *See supra* ¶ 11.  A valuation of even $175 million reflects a valuation of the 16 planes at the higher end of the range quoted by the independent valuation professional.  The actual fair value was likely lower than $175 million, and would support an even lower adjustment to the fair market value of the company in connection with the ESOP Transaction.

**The Transaction Financing Process Demonstrates Lack of Support for Defendants' Valuation**

63.     As described above, the ESOP Transaction was financed primarily by $410 million in corporate bonds issued by Western Global.  As reported by Bloomberg, in the last week of July 2020, Western Global first "began sounding out potential investors for the five-year bonds . . . at a yield in the 8.25% to 8.5% range," but in "a sign of tepid demand from potential investors, the range was revised on Tuesday [August 4, 2020] to 8.75% to 9%." Davide Scigliuzzo, *Cargo Airline Cashing in on Junk-Bond Boom for Owner Payout*, BLOOMBERG (Aug. 5, 2020), https://www.bloomberg.com/news/articles/2020-08-04/cargo-airline-boosted-by-covid-joins-debt-binge-for-owner-payout.

64.     Ultimately, even those 9% yields were not enough to entice investors, and the bonds were issued in August 2020 at a coupon rate of 10.375%, with a 5-year maturity in August 2025.

65.     Having to offer such a high interest rate, especially in the present low-rate environment, demonstrates that the marketplace views Western Global as being in precarious financial position as a result of issuing the debt, which would not be the case if the company were in fact worth the $1.36 billion at which it was valued for purposes of the ESOP Transaction.

66.     Every credit rating agency to opine on Western Global's financial health has classified them as being in the "junk bond" category.  And based on the 10.375%

coupon rate, the market views the $410 million bond offering as presenting comparable risk to CCC-rated bonds, which exhibit "substantial credit risk." *Rating Scales*, FITCH RATINGS, https://www.fitchratings.com/products/rating-definitions#ratings-scales (last visited Dec. 12, 2021).

67. According to the ICE BofA Single-B US High Yield Index Effective Yield, as of August 2020 when the bonds were issued, the average B-rated corporate bond had an effective yield of between 5.5 and 5.8 percent. Federal Reserve Economic Data, *ICE BofA Single-B US High Yield Index Effective Yield*, https://fred.stlouisfed.org/series/BAMLH0A2HYBEY (last accessed Dec. 14, 2021). The 10.375% coupon rate therefore reflected a marketplace view that the debt issuance had roughly a CCC rating, which reflects a view that the company is only 50% likely to repay the bonds.[12]

68. Issuing $400 million of corporate bonds would not create close to this type of financial precariousness for a company worth $1.36 billion whose only other debt was a $80 million secured loan. This is perhaps best illustrated by the interest rates that other, publicly traded air cargo companies with valuations similar to the company value assigned in the ESOP Transaction had to pay on corporate bonds that they issued.

69. As of the end of the first quarter of 2015, Atlas Air had a market capitalization of $1.075 billion.[13] The company then issued $224.5 million of

[12] *See* Federal Reserve Economic Data, *ICE BofA CCC & Lower US High Yield Index Effective Yield*, https://fred.stlouisfed.org/series/BAMLH0A3HYCEY (showing an average effective yield of between 12.2% and 12.5% on bonds rated CCC, CC, C, and D); *Default, Transition, and Recovery: 2020 Annual Global Corp. Default and Rating Transition Study*, S&P GLOBAL RATINGS, https://www.spglobal.com/ratings/en/research/articles/210407-default-transition-and-recovery-2020-annual-global-corporate-default-and-rating-transition-study-11900573 (showing a 5-year default rate of 47.48% on CCC-rated bonds) (last visited Dec. 12, 2021).

[13] For purposes of assessing creditworthiness, market capitalization, which is the marketplace's assessment of a company's value based on the price of its stock, is the

corporate bonds in June 2015 with a 7-year maturity date of June 1, 2024. Despite having a valuation that was $300 million lower than Western Global supposedly had in August 2020, Atlas was able to issue its bonds at a 2.25% interest rate, more than four times lower than the interest rate Western Global paid.

70.     Two years later, Atlas had a market capitalization as of $1.4 billion as of the end of the first quarter of 2017. Atlas then issued another $289 million of corporate bonds in June 2017 with a 7-year maturity date of June 1, 2024, and were able to do so at a 1.875% interest rate.

71.     Finally, as of the end of the first quarter of 2018, Air Transport Services Group had a market capitalization of $1.38 billion. The company then issued $258.8 million of corporate bonds in April 2018 with a 6-year maturity date of 10/15/24, but were able to issue the bonds at an interest rate of only 1.25%, eight times lower than the interest rate Western Global paid on its bond issuance.

72.     Given the general efficiency of markets, it is generally agreed that the prices of publicly traded stocks are an accurate reflection of the company's value. Given the reliability of the valuations of both Atlas Air and Air Transport Services Group (as publicly traded companies) in 2015 through 2018, if Western Global was worth $1.36 billion, it would have been able to issue $410 million of bonds at substantially lower interest rate than the company was ultimately forced to pay.

73.     All of this information was available to Defendants and their advisors, as the valuation had not been finalized at the time of the August 2020 bond issuance. Had Defendants and their advisors conducted a thorough and objective investigation of the value of Western Global, the parties would have significantly revised their valuation of the company downward, in line with the value that the marketplace and

---

relevant measure of value rather than enterprise value, which measures a company's hypothetical value if all of its debt were paid off. Given that Western Global had no debt prior to the ESOP Transaction, the Trustee Defendants' $1.36 billion is comparable to both the enterprise value and market capitalization of a publicly traded company.

credit rating agencies such as Fitch had assessed the company to be worth in demanding a 10.375% coupon rate on its debt. *See supra* ¶ 59 (discussing Fitch's measurement of Western Global's going-forward enterprise value).

**The Valuation Failed to Give Proper Weight to the Effect of Debt Incurred in ESOP Transaction on the Company's Future Financial Prospects**

74. The appraisal additionally failed to properly account for the substantial indebtedness incurred by Western Global in connection with the ESOP Transaction, the company's ability to service this debt, and the impact debt service would have on Western Global's future value.

75. As discussed above, Western Global took on hundreds of millions of dollars in outside debt to facilitate the ESOP Transaction and pay all or substantially all of the purchase price to the Seller Defendants. By utilizing outside, financial institution financing, the Seller Defendants were paid immediately, while the company became responsible for repaying the debt associated with the ESOP Transaction. In contrast, in a seller-financed ESOP deal, the ESOP borrows money from the seller to effectuate the transaction, and gradually repays the seller without saddling the company itself with any additional debt.

76. From an economic perspective, and for purposes of valuation, the difference between these two transactions is apparent. In the financial-institution-financed deal, the subject company itself has taken on additional debt, worsening its balance sheet and reducing its cash flow in order to service that debt. In other words, the transaction has reduced the value of the company. In the latter transaction, the only party taking on debt is the plan. And while the loan balance reduces the value of the plan's assets, the company itself is unaffected.

77. The Department of Labor, as expressed through multiple settlement orders with ESOP trustees that abrogated their fiduciary duties, has stressed the importance of analyzing the impact a loan taken out to finance a proposed ESOP

transaction has on the company post-transaction. For example, as part of a required analysis pursuant to a settlement with the DOL, an ESOP sponsor was required to analyze:

> - Whether the plan sponsor will be able to service the debt taken on in connection with the [t]ransaction (including the ability to service the debt in the event that the plan sponsor fails to meet the projections relied upon in valuing the stock);
>
> . . . .
>
> - The financial impact of the [t]ransaction on the plan sponsor[.]

Agreement Concerning Fiduciary Engagements and Process Requirements for Employer Stock Transactions at 17, *Perez v. GreatBanc Trust Co.*, 5:12-cv-01648-R-DTB (C.D. Cal. Jun. 6, 2014).[14]

78. The impact on Western Global of the debt incurred in relation to the ESOP Transaction is substantial. As discussed, Western Global operated debt-free prior to the ESOP Transaction. To finance the ESOP Transaction, Western Global incurred approximately one-half of a billion dollars in debt in the form of a junk bond offering and bank loans. The junk bond offering, which makes up over 80% of the overall financing, carries an exorbitant 10.375% interest rate amounting to around $40 million annually in interest payments alone. This amount is nearly equal to Western Global's prior five-year EBITDA average of $46 million, and nearly two-thirds of the five-year lease-adjusted EBITDA average of $65 million. In other

[14] Similar provisions regarding the consideration and treatment of corporate debt on proposed ESOP transactions are present in multiple numerous settlement orders involving the Department of Labor. *See, e.g.*, Consent Order and Judgment at 18, *Scalia v. Farmers National Bank of Danville et al.*, 1:20-cv-00674-JRS-TAB (S.D. Ind. Feb. 28, 2020); Agreed Consent Decree and Order at 43, *Acosta v. Veronica Mueller, et al.*, Civil Action No. 2:13-cv-1302-PP (E.D. Wis. Dec. 27, 2017); Consent Order and Judgment at 15, *Acosta v. First Bankers Trust Services, Inc., et al.*, 1:12-cv-08648-GBD (S.D.N.Y. Sept. 21, 2017).

words, because of the ESOP Transaction, Western Global has been saddled with interest payments that absorb at least two-thirds and as high as nearly all of the company's average EBITDA.

79. Even if the company is able to make payments on the debt, it will significantly impact Western Global's ability to succeed, or even survive, as a company. Western Global has a very old fleet that will need to be almost entirely replaced over the next decade. Its pilots, mechanics, and loadmasters are paid well below market wages, and the monies the company will need to devote to debt service may make it difficult, if not impossible, to retain a high-quality workforce. And finally, by tying up nearly all of the company's available cash flow, the ESOP Transaction threatens the safety of Western Global's workforce, by making it impossible for the company to make the necessary investments to modernize its safety equipment and properly maintain and repair its aircraft. In other words, at stake in this litigation is nothing less than the survival of the company itself.

## PLAN-WIDE RELIEF

80. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the Plan pursuant to this statutory provision.

81. Plaintiffs seek recovery for injuries to the Plan sustained as a result of the prohibited transactions of fiduciary duties during the statutory period and seek equitable relief on behalf of the Plan as a whole.

82. Plaintiffs are adequate to bring this derivative action on behalf of the Plan, and their interests are aligned with the Plan's participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation, and intend to pursue this action vigorously on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

83.    Plaintiffs additionally and alternatively seek certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

84.    Plaintiffs assert their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:

> All participants and beneficiaries of the Western Global Airlines, Inc. Employee Stock Ownership Plan at any time since its inception, excluding Defendants, or any other persons with responsibility for the Plan's investment or administrative functions.

85.    Numerosity: The Class is so numerous that joinder of all Class members is impracticable.  The Plan had approximately 350 participants as of the end of 2020.

86.    Typicality:   Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are Plan participants and suffered injuries as a result of Defendants' violations of ERISA. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan.  Defendants' improper actions affected all Plan participants similarly.

87.    Adequacy:   Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation.  Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

88.    Commonality: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

  a.  Whether the Trustee Defendants were fiduciaries of the Plan;

  b.  Whether the Selection Committee Defendants were fiduciaries of the Plan;

c. Whether the Oversight Defendants acted in a fiduciary capacity in connection with the administration of the Plan, the valuation of company shares; the sale of company shares to the Plan; and the financing of that purchase;

d. Whether the Defendants caused the Plan to engage in prohibited transactions under ERISA by permitting the Plan to purchase company shares and take loans from parties in interest;

e. Whether Defendants caused the Plan to pay more than fair market value for the company shares purchased from Seller Defendants in the ESOP Transaction;

f. Whether the Trustee Defendants acted with an eye single to the interests of participants and utilized the necessary skill, diligence, and care in hiring an independent appraiser, overseeing the appraisal and valuation of the company, and agreeing to purchase company shares on behalf of the Plan on the terms of the ESOP Transaction;

g. Whether the Selection Committee Defendants acted with an eye single to the interests of participants and conducted a thorough and independent investigation in the process of hiring a trustee for the Plan;

h. Whether the Oversight Defendants were legally responsible for monitoring the performance of the Selection Committee Defendants and the Trustee Defendants;

i. Whether the Oversight Defendants monitored the performance of the Selection Committee Defendants and the Trustee Defendants with an eye single to the interest of participants and with the requisite skill, care, diligence and prudence;

j. Whether the Trustee Defendants engaged in a prohibited transaction by acting on behalf of a party adverse to the Plan and its participants in the ESOP Transaction;

k. Whether the Trustee Defendants engaged in a prohibited transaction by receiving consideration for its own account in the ESOP Transaction;

l. Whether the Oversight Defendants are liable as co-fiduciaries for any prohibited transactions or fiduciary breaches by the Trustee Defendants or Selection Committee Defendants;

m. Whether the Seller Defendants knowingly participated in a prohibited transaction in connection with the ESOP Transaction;

n. The amount of losses suffered by the Plan and its participants;

o. The proper form of equitable and injunctive relief; and

p. The proper measure of monetary relief.

89. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

90. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of Plan fiduciaries, rescission or amendment of the ESOP Transaction, or appointment of an independent fiduciary would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

91. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

92. Plaintiffs and their undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court. If the class is certified under Rule 23(b)(1), "the court may direct appropriate notice to the class" but is not required to do so. Fed. R. Civ. P. 23(c)(2)(A). If the class is certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances," Fed. R. Civ. P. 23(c)(2)(A), which includes notice by United States mail, *id.*

## COUNT I
## Causing or Engaging in Prohibited Transactions
## 29 U.S.C. § 1106(a)–(b)
## Against the Trustee Defendants

93. ERISA Section 1106(a)(1)(A) prohibits a plan fiduciary from causing a plan to engage directly or indirectly in a sale or exchange of any property with a party in interest. The Trustee Defendants violated Section 1106(a)(1)(A) when they caused

the Plan to exchange company shares with the Seller Defendants, who are parties in interest, in exchange for cash consideration, as took place in the ESOP Transaction.

94.   ERISA Section 1106(a)(1)(B) prohibits a plan fiduciary from causing the Plan to borrow money from a party in interest.  Here, the Trustee Defendants caused the Plan to borrow money from Western Global, the Plan employer and party in interest, as took place in the ESOP Transaction.

95.   ERISA Section 1106(a)(1)(D) prohibits a plan fiduciary from causing the Plan to engage in a transaction that constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest.  Here, the Trustee Defendants caused the Plan to indirectly transfer Plan assets to the Seller Defendants, parties in interest, as payment for company shares, and also caused the Plan to directly transfer Plan assets to Western Global, also a party in interest, in the form of continuing payments on the company's loan to the Plan as part of the ESOP Transaction.

96.   The stock and loan transactions between the Plan and the parties in interest were authorized by the Trustee Defendants in their capacity as trustees for the Plan.

97.   ERISA Section 1106(b)(2) mandates that a plan fiduciary shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants." The Trustee Defendants caused the Plan to acquire WGA stock from the Seller Defendants for well above fair market value, with the proceeds of loans taken out by Western Global that were used to pay the Seller Defendants.  This primarily benefited the Seller Defendants to the substantial detriment of the Plan and its participants.

98.   ERISA Section 1106(b)(3) provides that a fiduciary may not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  The Trustee Defendants received consideration in the form of fees of its own personal account

from Western Global, in connection with the Trustee Defendants acting as trustees in connection with the ESOP transaction, in violation of 1106(b)(3).

99. ERISA Section 1109 provides that any person that is a fiduciary with respect to a plan and that breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

100. ERISA Section 1132(a) permits a plan participant to bring a suit for relief under Section 1109 and to obtain appropriate equitable relief to enforce the provisions of ERISA.

101. The Trustee Defendants caused losses to the Plan resulting from the above-mentioned prohibited transactions, and are liable to the Plan for those losses in addition to appropriate equitable relief to be determined by the Court.

## COUNT II
## Breach of Duties of Loyalty and Prudence
## 29 U.S.C. § 1104(a)(1)(A)–(B)
## Against the Trustee Defendants, Selection Defendants, and Oversight Defendants

102. ERISA Section 1104(a)(1) requires a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan and defraying reasonable expenses of administering the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

103. The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer

a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

104.   In the context of a transaction involving the assets of the Plan, the duties of loyalty under ERISA § 404(a)(1)(A) and care, skill, prudence and diligence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determine that the plan and its participants receive adequate consideration for the plan's assets and the participants' accounts in the plan.

105.   Pursuant to ERISA § 1002(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

106.   The Trustee Defendants was required to undertake an appropriate and independent investigation of the fair market value of WGA stock in 2020 in order to fulfill its fiduciary duties.  An appropriate investigation would have revealed that the valuation assigned to WGA stock in the ESOP Transaction was several times higher than WGA stock's fair market value.  The Trustee Defendants also failed to act exclusively in the best interests of Plan participants, with an eye single toward their best interests, instead attempting to advance its own best interests by demonstrating to the marketplace that it is a cooperative trustee, willing to "play ball" with selling owners in order to make sure they get the best possible price for their ownership interest.  For these reasons, the Trustee Defendants breached their fiduciary duties.

107.   The Selection Defendants failed to act exclusively in the best interests of Plan participants in hiring the Trustee Defendants, acting instead at the behest of the Seller Defendants in identifying a trustee who would ensure that the Seller Defendants' company shares were sold to the ESOP at a high price.  The Selection Defendants also failed to engage in a thorough and independent investigation of potential ESOP trustees in fulfilling its fiduciary duties.

108.   The Oversight Defendants, in their capacity as members of the Board of Directors, acted in a fiduciary capacity in orchestrating the ESOP Transaction and broadly dictating the terms of the transaction, including a price over $500 million and a transfer of 49 percent or less.  The Oversight Defendants took steps to finalize this transaction by arranging the issuance of around $400 million of high-interest corporate bonds and a secured loan from Truist Financial to ensure the Seller Defendants were paid up front.  The Oversight Defendants further exerted influence over both the Selection Defendants and Trustee Defendants to ensure that the transaction was finalized in a manner that best advanced their own interests.  These actions were not taken exclusively in the best interests of participants, or with the skill, care, diligence and prudence that a fiduciary acting under similar circumstances would act.  For these reasons, the Oversight Defendants breached their fiduciary duties.

109.   ERISA Section 1109 provides that any person who fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate.

110.   Section 1132(a) permits a plan participant to bring a suit for relief under Section 1109 on behalf of the plan and to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of the Plan.

111.   Accordingly, the Trustee Defendants, Oversight Defendants, and Selection Defendants are liable for losses suffered by the Plan as a result of the above-mentioned fiduciary duties as well as appropriate equitable relief to be determined by the Court.

**COUNT III**
**Failure to Monitor Fiduciaries**
**29 U.S.C. § 1104(a)(1)(A)–(B)**
**Against the Oversight Defendants**

112. Any fiduciary with the power to appoint and/or remove other fiduciaries has an obligation to monitor the appointed fiduciary to ensure that he/she is acting in compliance with the terms of the Plan and in accordance with ERISA. *See* 29 C.F.R. § 2509.75-8 (FR-17). If the appointed fiduciary has violated or continues to violate ERISA, the monitoring fiduciary must remove the appointed fiduciary and attempt to restore any losses to the plan caused by the ERISA violations.

113. As described above, as the party responsible for selecting the Selection Defendants, the Oversight Defendants had an obligation to monitor their performance and remove them when they failed to act in accordance with ERISA.

114. Additionally, pursuant to their authority over the Plan as the sole members of Western Global's board, the Oversight Defendants had a duty to monitor the performance of the Trustee Defendants, to ensure that they administered and managed the Plan, including engaging in a prudent process of selecting and monitoring an appraiser, while acting exclusively in the interests of Plan participants. The Oversight Defendants had a responsibility to remove the Trustee Defendants when they failed to execute these duties in accordance with ERISA.

115. The Oversight Defendants stood by, taking no appropriate action, as the Trustee Defendants and Selection Defendants failed to act in accordance with their fiduciary duties, and caused the Plan to engage in prohibited transactions, as described above.

116. Accordingly, the Oversight Defendants are liable to the Plan and its participants for losses caused by this monitoring failure and for appropriate equitable relief to be determined by the Court.

**COUNT IV**
**Co-Fiduciary Liability**
**29 U.S.C. § 1105(a)**
**Against the Oversight Defendants**

117.   ERISA Section 1105(a)(1) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary" or "has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

118.   The Oversight Defendants were the highest level of management at Western Global and were involved in the preparation of the financial data and projections underlying the stock appraisal the Trustee Defendants relied upon in selling the company shares to the Plan.

119.   The Oversight Defendants were responsible for procuring financing for the ESOP Transaction in the form of high-interest corporate bonds and a secured bank loan, to ensure the Seller Defendants were paid in full, up front, for the minority ownership stake transferred to the Plan.

120.   Given that the Oversight Defendants were responsible for negotiating the terms of the stock transfer, including the lack of management or voting rights or other indicia of control and the lack of any requirement to appoint an independent board member, the Oversight Defendants had knowledge that the price paid for the company shares did not reflect an adequate discount to reflect the Seller Defendants' continued control of the company after the transaction.

121.   And given their management of Western Global since its inception, their involvement in other sales of air cargo businesses, and their decades of experience in the aviation business, the Oversight Defendants were aware that the price of company shares was being unduly influenced by a short-term spike in profitability caused in

large part by short-term economic factors that were very unlikely to persist, and that the company shares were being sold for several times above their fair market value.

122. For all these reasons, the Oversight Defendants knowingly participated in the ERISA violations, and also had knowledge of the ERISA violations but took no actions to remedy them. For these reasons, the Oversight Defendants are liable as co-fiduciaries under 29 U.S.C. § 1105(a), and are therefore jointly and severally liable for the fiduciary breaches of the Trustee Defendants and the Selection Defendants outlined in Counts I–III.

**COUNT V**
**Knowing Participation in Prohibited Transactions**
**29 U.S.C. § 1132(a)(3)**
**Against the Seller Defendants as Non-Fiduciaries**

123. As discussed in Count One, the Trustee Defendants caused the Plan to engage in prohibited transaction with the Seller Defendants, in violation of 29 U.S.C. § 1106(a).

124. As described *supra* ¶¶ 37-38, the Seller Defendants were parties in interest both before and after the ESOP Transaction.

125. Thus the Seller Defendants are also liable as non-fiduciary parties in interest under *Harris Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000) because each of them knowingly participated in transactions which violated ERISA § 1106(a)(1)(A) and (D).

- As Board members, and officers, the Seller Defendants were directly involved in and directed the preparation of financial statements as well as financial projections underlying the stock appraisal forming the basis of the ESOP Transaction.
- Having closed on both the bond issuance and the secured loan, the Seller Defendants were aware that the broad contours of the ESOP Transaction and purchase price were pre-ordained, before the Trustee Defendants had completed their valuation.
- Based on the need to issue the corporate bonds used to finance the transaction at a coupon rate of 10.375%—nearly double the effective

yield of the average "junk" bond in the marketplace—the Seller Defendants were aware the marketplace believed Western Global had nearly a 50% likelihood of defaulting on the bonds, and that therefore Western Global was worth several times less than the $1.36 billion valuation assigned to the company as part of the ESOP Transaction.

- As owners of the airplane leasing companies, the Seller Defendants were aware that, despite their representation, the Seller Defendants were not in fact transferring all of planes that they owned to Western Global as part of the ESOP Transaction, and that they had in fact purchased a 747 aircraft in April 2020 that they planned on leasing back to Western Global after the ESOP Transaction had closed.
- As directors and executives in Western Global, the Seller Defendants were aware of the poor condition of Western Global's fleet of aircraft, and that nearly a third of the fleet was generally grounded for maintenance or repairs at any given time, representing significant risk to the company, and also demonstrating that the value of the aircraft assets transferred to Western Global as part of the ESOP Transaction was less than what was represented to the Trustee Defendants.
- The Seller Defendants knew that the profit projections relied upon by the Trustee Defendants failed to take into account the cyclical nature of the profitability of air cargo transportation, and the fact that revenue per ton and load factor were near multi-decade highs in the recent quarters that the Trustee Defendants had assume would continue apace for years into the future.

126. Thus, based on their knowledge of the fiduciary status of the parties to the ESOP Transaction, and their knowledge of the circumstances that rendered the ESOP Transaction illegal under ERISA, the Seller Defendants are liable for appropriate equitable relief as nonfiduciary parties in interest.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment against Defendants and for the following relief:

A. Declare that the Trustee Defendants caused the Plan to engage in and itself engaged in prohibited transactions;

B.     Declare that the Trustee Defendants, Selection Committee Defendants, and Oversight Defendants breached their fiduciary duties under ERISA to the Plan and its participants;

C.     Declare that the Oversight Defendants are liable as co-fiduciaries for the Trustee Defendants' prohibited transactions and fiduciary breaches;

D.     Declare that the Seller Defendants knowingly participated in prohibited transactions in violation of ERISA;

E.     Order Defendants to make good to the Plan and/or any successor trust(s) the losses resulting from the violations of ERISA and to disgorge any profits they made through the use of Plan assets;

F.     Order rescission of the ESOP Transaction;

G.     Impose a constructive trust on all payments received by the Seller Defendants as a result of the ESOP Transaction;

H.     Order that Defendants provide other appropriate equitable relief to the Plan and its participants and beneficiaries, including but not limited to surcharge, providing an accounting for profits, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Defendants;

I.     Order the removal of the Trustee Defendants as trustees of the Plan, to be replaced by an Independent Fiduciary;

J.     Enjoin the Selection Committee Defendants and Oversight Defendants from serving the Plan in any fiduciary capacity;

K.     Order the proceeds of any recovery for the Plan to be allocated to the accounts of the class members to make them whole for any injury that they suffered as a result of the breaches of ERISA declared by the Court;

L.    Order the allocation to the accounts of class members additional shares of stock that would have been allocated to their accounts but for the Plan's overpayment for Western Global stock and Defendants' fiduciary breaches;

M.    Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

N.    Prejudgment and post-judgment interest;

O.    Certify Plaintiffs' authority to seek plan-wide relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2);

P.    Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiffs as class representatives, and their counsel as class counsel; and

Q.    Award such other and further relief as the Court deems just and equitable.

Dated: December 14, 2021            **NICHOLS KASTER, LLP**

/s/ Matthew C. Helland
Matthew C. Helland

ATTORNEYS FOR INDIVIDUAL AND REPRESENTATIVE PLAINTIFFS